JOHN CRABTREE, Plaintiff in Error, *v.* WILLIAM KILE *et al.,* Defendants in Error.

### ERROR TO EDGAR.

In impeaching the credit of a witness, his general reputation is the subject of inquiry, not particular facts. The impeaching witness must be able to state what is generally said of the person to be impeached, among his associates.

It is error to permit one witness to speak of the character of another, unless he knows what the general character of that other is.

Where a vendor of chattles, having title, sells with warranty as to quality; and a consideration is given, and possession is taken under the sale, the vendee must rely on the contract of warranty, to recover for any loss resulting from defects covered by it. And the vendee, without the concurrence of the vendor, cannot rescind the sale, so as to revest the title in the vendor. Therefore a notice of the defect or an offer to return the property is unnecessary, in order to recover damages.

Damages for a breach of warranty of chattels sold, may be recovered in an independent suit, or they may be set off, in an action on the contract for the sale of them.

Where diseased cattle were sold, under a warranty of their healthiness, the measure of damages is the difference between the contract price agreed upon for healthy animals, and their value as diseased animals at the time of delivery, together with any other immediate injury resulting from the breach of warranty.

If cattle were bought, warranted to be in health, the purchaser notifying the seller at the time, that he designed to ship them directly to New York to sell for beef— and he did so ship them, the purchaser may recover for loss and expenses incurred, on those that showed disease or died on the passage.

Crabtree v. Kile et al.

THIS was an action of assumpsit, brought by Kile & Nichols originally in the Edgar Circuit Court against John Crabtree, on a promissory note, dated October 4th, 1856, for $2,550.00, executed by Crabtree to Kile and Nichols, for a lot of eighty-one head of fat cattle sold by plaintiff to defendant, and removed by change of venue to Coles county.

The declaration contains a special count upon the note, and the usual common counts.

The defendant pleaded the general issue, with notice that he would give in evidence that the note was executed in payment for a lot of fat cattle sold by plaintiff to defendant for the New York market; that the plaintiff warranted the cattle sound and free from the disease called milk sick or trembles; that said cattle had the disease at the time, and that it developed itself on the way to New York, to which market the defendant shipped the cattle, and that about forty head were lost and died on the way, in consequence of it; also that the residue of the cattle, in consequence of their diseased condition, were of no value in market and wholly lost to defendant, by reason of which he sustained great damage by the said breach of the warranty of the plaintiffs, and incurred necessarily heavy expenses in doctoring and taking care of the cattle, and by the delays occasioned in consequence of the diseased condition of the cattle; all of which he wishes to set off by way of recoupment against the plaintiff's claims on the note, and asks judgment for the balance that may be found due him.

There were, also, notices of other grounds of defense, in consequence of the diseased condition of the cattle which the defendant proposed to offer in evidence, founded on deceit, fraudulent concealment, fraudulent representations of the plaintiff, etc., going some to partial and others to entire failure of the consideration of the note sued upon, and by way of recoupment and set-off.

On the trial of the case the plaintiff offered in evidence the note which is in the words and figures following:

$2,550.00.                    Paris, Illinois, Oct. 4th, 1856.

Twenty days after date I promise to pay Kile & Nichols or order, twenty-five hundred and fifty dollars, for value received.

Signed,              JOHN CRABTREE.

With the following credits endorsed upon it: "Received, Nov. 4th, 1856, on the within note, one thousand dollars. Kile & Nichols." "Credit on the within note by twelve steers, at thirty-four dollars each, being four hundred and eight dollars. Oct. 12th, 1856. Kile & Nichols."

And the plaintiffs then rested their case.

The defendant then offered in evidence the foregoing credits on the note, and proved by *J. W. Blackburn* that Kile, one of the defendants, admitted the note was given for the eighty-one head of cattle. That he was acquainted with Kile and Nichols farm, at Mulberry Grove, and that milk sick prevailed in that vicinity in 1846–7, and since; that the grove is three miles long, with a slough through it; that the disease is generally supposed to be east of the slough in the heavy timber; that the house is two or three hundred yards west of the slough; that the slough runs into a pasture or feeding lot; the milk sick prevails only in the fall, after frost, and prevails most in dry seasons.

*Claybaugh* proved that he was present when defendant bought the cattle, that the plaintiff, Nichols, insured them sound and free from milk sick or trembles; that defendant informed Nichols at the time, that he was buying for the New York market, and that he did not want them if they had trembles or had run where they could get it; that Nichols again repeated that he would insure them free from milk sick, and that they had not run in the grove where it prevailed. Defendant then agreed to take them on these conditions, at $34 per head, eighty head of them; this was the latter part of September, 1856, near the last, or perhaps the 1st day of October. No one was present when the bargain was closed, but plaintiff Nichols, defendant and witness. The cattle were to be divided the next day, or within a day or two; Crabtree was to have the pick out of the whole lot of cattle which was on the farm. Where Crabtree lived, there was no milk sick.

*John Hayns* proved that he went with the defendant Crabtree, after the cattle, that while they were separating them in the lot where they were, Crabtree said that if they had the sick stomach or trembles, he did not want them. Nichols said he need not be afraid, he would insure them free from it; that they had not run in the grove where it was.

Several other witnesses swore to the fact of the warranty, and also that the cattle were diseased; that some of them died on the route to New York, and that others were left on the way; that they were sent forward soon after they were purchased, by railroad to New York, for sale, for beef.

*Titus*, introduced by defendant, stated he was acquainted with the general reputation of Lacy, (a witness sworn for defendant below,) for truth and veracity; think I have heard a majority of his neighbors speak of it; they don't speak well of it for truth and veracity.

*French*, also, proved that his reputation for truth and veracity was bad.

The defendant objected, at the time, to the evidence of witnesses in reference to Lacy's character, and asked the court to exclude it, because said witnesses did not state that they knew his general character for truth and veracity, or that they had ever heard a majority of his neighbors speak of it. The court overruled the objection, and permitted the evidence to go to the jury.

On the examination of Moses Crabtree in chief, the defendants asked the following question: " What expenses were necessarily incurred in consequence of the cattle being diseased, and the disease developing itself on the way ?" to which the plaintiff objected, and the court sustained the objection and did not permit the witness to answer; and the defendant excepted to the ruling of the court sustaining the objection, and refusing to permit the witness to answer.

There was a trial by jury before EMERSON, Judge, and a verdict and judgment for plaintiffs, in the court below, for the whole amount claimed.

A. GREEN, and READ & BLACKBURN, for Plaintiff in Error.

LINCOLN & HERNDON, for Defendants in Error.

WALKER, J. That the credit of a witness for veracity may be impeached by general evidence, is one of the well established rules of law. But in *impeaching* the credit of a witness, the examination must be confined to his general reputation, and not be permitted as to particular facts. The regular mode of examining into his general reputation is to inquire of the witness, whether he knows of the general reputation of the person in question among his neighbors, and what that reputation is. The practice in the English courts is to further inquire, whether from such knowledge he would believe that person upon his oath. The inquiry must be made as to his general character, where he is best known. It is not enough that the impeaching witness merely states what he has heard " others say," for they may be few. He must be able to state what is *generally said* of the person by those among whom he associates, and by whom he is known ; for it is this only that constitutes his general reputation or character. And it is error to permit the impeaching witness to speak to the character of the person unless he is acquainted with such general character. In this case, neither of the witnesses, Dole and Wright, state that they knew what Lacy's general character was, and consequently their evidence in regard to his character for truth and veracity, was improper, and should have been excluded by the court, when asked by defendant.

The inquiry also arises as to the right of defendant to recover damages on this warranty, and whether they may be set off in this suit, and as well as the measure of damages on a breach of warranty on the sale of these cattle. The rule is laid down by Chitty that, "It is not necessary to offer to return the goods previous to an action for the breach of an express warranty, or at any other time. The purchaser may resell, and declare specially for the loss, or difference; nor is there any occasion even to give *notice* of the breach of warranty to the seller; but the not giving such notice will be a strong presumption against the buyer that the goods, at the time of the sale, had not the defect complained of, and will make the proof much more difficult. If there has been no offer to return the goods, the measure of damage is merely the difference between the sum given and the real value, although there has been no resale by the vendee." Chit. Cont. 362. And the same rule is laid down by Story, in his work on Sales, 393, and it is believed to be the true rule. And, "where the vendor of a warranted chattel, whether it is a specific chattel or not, sues for the price or value, it is competent to the defendant, the purchaser, in all cases, to prove the breach of warranty in *reduction of the damages;* although the goods were sold at a fixed price and have not been returned, or have been resold by the defendant, the vendee." Chit. Cont. 363.

These authorities seem to proceed upon the ground that when the vendor has title and sells with warranty as to quality, and the purchase money is paid, or notes or bills given, and possession taken, and nothing farther remains to complete the sale, that the title passes, and the vendee must then rely on the contract of warranty to cover any loss resulting from defects covered by the warranty. And that he, by no subsequent act of his, without the concurrence of the vendor, can rescind the contract and revest the title to the property in the seller. And for that reason a notice of a defect, or an offer to return the property, is not necessary. The rule may be different in cases of a breach of warranty of title, which is not necessary to be determined in this case. And in case of fraudulent sales, as the purchaser upon discovering the defect has the right to rescind, it may be that he should give notice or offer to return before he can recover back the purchase money. We cannot perceive any reason why the party, when he has received the property with the warranty, that he should be required to give notice, or to return the property, before he may maintain an action for a breach of the warranty. The sale is not conditional, that the title shall only pass in the event that the contract of warranty is not broken. And if it is a complete cause

of action without offering to return, or of giving notice of a breach of the warranty, the damages may be set off in this case, notwithstanding they are not liquidated, as they grow out of the contract sued upon. *Nickolls* v. *Ruckells*, 3 Scam. R. 300. Or they may be given in reduction of damages, when the suit is for the purchase money.

The ordinary remedy on a breach of warranty of this kind, where the price has been paid, is by an action upon the warranty. In such an action he may recover the difference between the price paid and the actual value of the property at the time and place of delivery, with all its defects and vices. So, also, if he sustain other additional injury which is the immediate result of the breach of warranty, or a natural incident thereto, he may recover damages therefor. Story on Sales, sec. 454. The measure of damages in this case would, therefore, be the difference in the contract price and the value of the cattle at the time of their delivery in their then diseased condition, together with any other immediate injury resulting from the breach of warranty. These cattle were purchased to be put immediately into the New York market, for beef, and this the defendant in error knew when he made the warranty of soundness. They were not purchased for feeding purposes, nor as cattle diseased with the milk-sickness, to be treated and cured on speculation. And their value at the time of their purchase and delivery must be fixed with reference to the purposes for which they were purchased, and not with reference to other objects not contemplated by the parties at the time. The plaintiff in error had no knowledge of the cattle being diseased until after he had removed them, nor is there any evidence in the case that such cattle could have been sold to persons with a knowledge of their diseased condition. The plaintiff in error had the undoubted right to rely upon the warranty, and to act in good faith upon the supposition that they were sound, until the disease manifested itself; and then he had a right to sell them for the best price he could obtain for such cattle. He was not bound to change his purposes and delay his trip for weeks, months, or even longer, to see if those attacked with disease would recover, nor was he bound to find a speculator and dealer in diseased cattle, affected with milk sickness. If he acted in good faith and with prudence in freighting the cattle, he had a right to recover the expenses incurred on those that died or manifested disease, which they had when purchased, before reaching New York. But after discovering that they were diseased, it became his duty to dispose of them without incurring further expense, and if he did so, such expense would not be the proximate and natural

consequence of the breach of warranty, and would not be recoverable.

If there was fraud in this case, then, to have rendered the sellers liable for the costs of keeping the cattle left on the way, notice should have been given to them of the intention to rescind the contract. But in this case there was no such notice, nor was it urged that any fraud was committed in making the sale of the cattle.

We are of the opinion that the judgment of the Circuit Court should be reversed and the cause remanded.

*Judgment reversed.*